## DRODDY v. INDUSTRIAL LUMBER CO., Inc.

### No. 1012.

Court of Appeal of Louisiana. First Circuit. June 30, 1932.

Thornton, Gist & Richey, of Alexandria, for appellant.

Woosley & Cavanaugh, of Leesville, for appellee.

ELLIOTT, J.

Joe Droddy, employed by Industrial Lumber Company, Inc., in cutting wood, accidentally cut his left foot with an ax severely wounding himself. He alleges that the wound resulted in septicemic polyneuritis, producing in him a permanent total disability to do work of any reasonable character.

He brought suit against Industrial Lumber Company, Inc., claiming compensation at the rate of $7.80 per week for 400 weeks, less certain payments received and an additional $100 as medical fees and expenses.

The defendant, for answer, admits that plaintiff, while employed as alleged, received an incise wound on the inside of the instep of his left foot. It alleges that he entirely recovered from said wound on April 11, 1931. That it paid him compensation for 4⅗ weeks, the period of his disability on said account, and alleges that it does not owe him any more.

That after plaintiff was discharged by its physician on April 11, 1931, he returned to work and some time thereafter developed a diseased condition of the joints of his body, which was in no manner caused by or contributed to by the accidental injury sustained in its employment. That said diseased condition of the body, so respondent is informed and believes and therefore alleges, has greatly impaired plaintiff's health.

It denies that it is liable for the medical fees and expense claimed by the plaintiff.

It avers that plaintiff was treated by physicians at the request and expense of your respondent in so far as any treatment was necessary for the injury received to his foot while employed by defendant. That after said recovery plaintiff returned to work, and it was only after he returned that he developed some diseased condition in the joints of his body, which is entirely responsible for his present condition.

The lower court for written reasons rendered judgment in favor of the plaintiff as prayed for. Defendant has appealed.

The Employers' Liability Act of this state, section 38 (amended by Act No. 38 of 1918, p. 60), reads as follows:

"The word 'accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.

"The terms 'Injury' and 'Personal Injuries' shall include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom. The said terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."

And section 18, subsec. 4 (amended by Act No. 85 of 1926, p. 120), provides:

"But all findings of the fact must be based upon competent evidence and all compensation payments provided for in this act, shall mean and be defined to be for injuries and only such injuries as are proven by competent evidence, of which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself."

■ The plaintiff must establish his right to compensation by competent evidence and within the terms and intendment of the law on the subject.

The evidence shows that on March 2, 1931, the plaintiff accidentally cut his left foot as alleged. He went to a physician in the employ of defendant, who treated the wound up to April 11, 1931, and pronounced it cured. The plaintiff's compensation was then stopped and he was told to go back to work, which he did on April 13, 1931.

Upon returning to work he worked about two weeks and was then informed that there was no need for more wood at the time and he was laid off for a couple of weeks. He then returned to work and worked one day, but on the morning of the second day of his second return, which must have been on or about May 17, 1931, before reaching the place of his work, in the woods, he was seized with a violent chill, high fever soon developed, and he has never been able to work since. All the medical testimony on the subject agrees that plaintiff, since he was taken with said chill, has been, and is now, a total disability as to work of any reasonable character, but they are not agreed as to the cause, and the question is: Which of these opposing opinions shall prevail?

Plaintiff testifying in his behalf and speaking of the time of trial says he was thirty-seven years old. That he had been working around sawmills and doing work as a laborer since he was about thirteen years of age. That he has never lost a day from work that he knew of, and was never in bed from sickness.

That he had worked for the Power Lumber Company for seven or eight years.

Plaintiff was asked to state the nature of his wound:

"Q. Did it cut deep? A. Yes, Sir. It cut plumb to the bone. I could see the bone before it went to bleeding."

He testified that at the time he was discharged as having recovered from his wound and told to return to work, "I told him (referring to defendant's physician who had been treating him) that I couldn't put my

weight on it, (meaning his foot) that it hurt me, but he told me to go ahead and try it." That his foot was hurting him at the time and has hurt him ever since. That when defendant's physician discharged him as recovered from his wound, he could put his shoe on, but his foot swelled where he never could lace it up. It was sore all the time.

The plaintiff received some corroboration from Leon Doyal, who apparently has no interest in the result of the suit and who testified that he had noticed plaintiff walking after the injury to his foot; that he passed his house on his way to work for defendant, and that he always limped, appeared to be crippled; and that he had never before noticed him limping.

As against this the defendant placed on the stand plaintiff's brother, Mazlee Droddy, who testified that plaintiff worked under him and that when he came back to work the first time after his injury, he worked as he did before, and that if he made any complaint to him about his foot hurting or swelling, or anything like that, he never paid any attention to it; he did not remember plaintiff saying anything about it. That when he came back the second time if he made any complaint to him, he forgot all about it and never paid any attention to it; did not remember plaintiff saying anything about it. If plaintiff walked crippled, he did not notice it. This witness is in the employ of defendant.

Ralph Thompson, woods foreman over plaintiff, says that after plaintiff returned to his work he never complained to him; that he observed him walking, but he appeared to be normal, and he never noticed him limping.

Defendant's physician who first treated plaintiff's injured foot testifies that his foot healed entirely without any infection in a week or ten days and that there was no swelling, inflammation, redness, or anything of that kind. That the cut did not go to the bone; it only went through the skin. That he kept plaintiff on compensation for five or six weeks from the time of his injury; that if there had been any infection, the wound would not have healed and would have showed up before six weeks. He subsequently examined plaintiff and found him in a bad condition, due to infection which he attributes to bad mouth, teeth, and gums, but notwithstanding the testimony of this physician and his perfect good faith is not questioned, it is sure that when plaintiff returned to work on or about May 17, 1931, which was about 2½ months after his injury, he was seized with a chill and developed high fever, and all the physicians agree that infection in its gravest form existed at that time, but they do not agree that it resulted from his foot.

Dr. Strother was engaged by the plaintiff to treat him after he was taken with the chill and fever. Dr. Strother, after treating him for some time, called Dr. Reisor in consultation, who examined him on June 18, 1931, which was about 3½ months after his injury. Dr. Reisor, giving his testimony as to the cause of plaintiff's present condition, says that he agreed with the diagnosis of Dr. Strother. That he found plaintiff suffering with an acute septicemic poliomyelitis due to general septicemic condition and due directly and positively to a focus of infection in his injured foot; that an advanced state of osteomyelitis also existed, due to the same cause. This physician was examined and cross-examined at length. He testified firmly giving reasons based on the history of the case, and the history upon which he acted has been taken into account. He gave it as his opinion that the bones in plaintiff's foot were injured by the blow of the ax, thus supporting plaintiff, who testified that the wound exposed to his view the bones in his foot.

Dr. Reisor, Dr. Strother, and Dr. Brown Word found plaintiff suffering with poliomyelitis and osteomyelitis and were of the opinion that these diseases had been produced by the injury to plaintiff's foot.

The testimony of these physicians, the reasons and explanations they make, has carried to our minds the conviction that their diagnosis is correct and that plaintiff has established his right to recover within terms and intendment of the law on the subject.

We quote from the testimony of Dr. Reisor as follows:

"Q. Doctor, what has happened, in your opinion, in this case? A. My opinion is that this man sustained an injury to his foot consisting of both an incision and a contusion causing the entrance of an infection. Nature always attempts to localize or capulate an infection. To have what we call a focal infection, rather than a general infection or systemic infection. I am sure that in this case this man had the entrance of an infection in that foot that was localized and then capulated and held dormant, outside of the general blood stream until, for some reason, probably due to local external trauma, the capulation broke down and the septicemia became general.

"Q. Would walking on that foot or trying to use that foot at the time this man did, having pain with it, would that cause it to break down? A. Yes. It would make it more likely to break down. Probably if the foot had had absolute rest, you would have had elimination by evacuation rather than by absorption. There might have been a discharge that would not have affected his health."

Questions of the court:

"Q. Would it be as long as two or three weeks? A. Yes, Sir. Sometimes a focal infection will exist for years in practically a

dormant condition. As long as it is walled off from the general circulation the trouble is only local and nature has a tendency to wall off all infection. You will find that in abdominal conditions such as appendicitis where the appendix is infected and walled off.

"Q. You don't find that usually in incised wounds—, where nature walls off infection? A. As I understand it, this is both an incised and a contused wound."

This physician gave it as his opinion that the infection existed in plaintiff's foot from the time of the injury.

Five physicians were called by the defendant. One of them, an expert roentgenarian, did not make a clinical examination of plaintiff, but made X-ray pictures of different portions of his body showing the conditions of the bones at the joints and testified to the diseased condition of the bones as shown by the pictures made.

Two of the physicians called by defendant had treated the plaintiff on account of his wounded foot. They expressed the opinion that the plaintiff's present condition did not originate with and was not the result of the foot injury he had received. They claim that plaintiff's foot healed without infection.

Dr. Holcomb examined plaintiff clinically and was questioned and cross-questioned at length. He was asked on cross-examination:

"Q. If there had been some injury to the bony structure of the foot at the seat of the injury and the wound had healed over, would that bring about this infection and cause this man's present condition? A. That is possible, but I think in this particular case it is highly improbable, for the mere fact that more evidence would have been brought out, from an X-ray standpoint, in localizing this particular infection. As a matter of fact the history given by the patient rather precludes a proposition like that."

But the further testimony of this physician indicates that his opinion is based largely on the fact that the bones in plaintiff's foot were not injured by the blow of the ax. Our inference from what he says is that he was influenced by the statement of the physician who had first treated the wounded foot, that the skin was only cut through and the bone not touched. It is our experience, working individually, that we occasionally fail to observe something soon afterwards detected by another. In this instance, the established facts and sequence of events requires the conclusion that the physician who first treated plaintiff's foot believed that it was cured without infection, but he was in error.

■ And now acting on the difference of opinion which we find to exist among the physicians as to the cause of plaintiff's present condition, we find that it is due to the injury he received by cutting his foot, as alleged in his petition, and that the lower court made no mistake in rendering judgment in favor of the plaintiff as prayed for on that account.

■ The lower court condemned the defendant to pay an item of $100 as medical expenses. Defendant contends that this was error and prays that this claim be rejected. The Employers' Liability Act, section 8, subsec. 5 (amended by Act No. 242 of 1928, p. 357), provides that:

"The employer shall in every case coming under this act, furnish reasonable medical, surgical and hospital services and medicines not to exceed $250.00 in value, unless the employee refuses to allow them to be furnished by the employer."

Defendant contends that its physicians treated plaintiff's foot from the time it was cut up until he returned to work, and that when taken with a chill and incapacitated for further work, he never called on them for any further treatment, and that they should not be required to pay the physicians employed by him.

It is true plaintiff was treated by doctors for his wounded foot and was kept under their observation and treatment for four or five weeks, but he was then discharged and told to return to work, which he did. After returning to work, some 2½ months after he had been discharged, he was seized with a chill and fever in the woods and was carried home, upon which he sent for Dr. Strother, who treated him and discovered the very grave trouble which he was then found to have, as a result of the injury to his foot. He and another called in consultation are endeavoring to do all that medical science enables them to do for him in his present condition.

He had been discharged by defendant as cured, but he was not cured, and we are of the opinion that under the terms of the statute requiring defendant to furnish medical treatment up to $250, the item of $100 for the physician or physicians of plaintiff's choice is reasonable.

The allowance leaves $150 for the services rendered by defendant.

The judgment appealed from is in our opinion correct in all respects.

Judgment affirmed. Defendant and appellant to pay the cost in both courts.