## JONES v. LAKE CHARLES COMPRESS & WAREHOUSE CO., Inc.

### No. 1283.

Court of Appeal of Louisiana. First Circuit. March 6, 1934.

C. V. Pattison, of Lake Charles, for appellant.

Hawkins & Pickrel, of Lake Charles, for appellee.

ELLIOTT, Judge.

Leon Jones, employed by Lake Charles Compress & Warehouse Company, Inc., in the operation of a band cutting machine, alleges that while so employed he received an injury on the front part of his leg about 8 inches below the knee, producing in him a permanent total disability to do work of any reasonable character. He alleges that said injury occurred on May 4, 1932; that he was receiving at the time 20 cents per hour, working 10 hours per day, and 6 days per week, making an average weekly wage of $12.

Alternatively and in the event it be found that said injury is not the sole cause of his present disability, he then alleges that his leg injury aggravated, stirred into activity, and made worse a dormant, latent disease, and that he is disabled as above stated on that account.

He claims of Lake Charles Compress & Warehouse Company, Inc., compensation for 400 weeks, based on the wage above stated.

Lake Charles Compress & Warehouse Company, Inc., for answer admits that plaintiff received an injury on his left shin, while in its employment on April 28, 1932, causing his left shin to be bruised and skinned; but avers that the injury was very slight, that plaintiff was given first aid treatment at its office and thereafter sent to a physician, who treated him on account of his injury from May 2, 1932, to June 27, 1932, a period of about 11 weeks, and that at the end of the time stated he was cured and discharged. That on or about July 16, 1932, plaintiff reported to its physician for another treatment, telling him that he had hurt his leg again, etc.

Defendant denies that plaintiff is disabled to do work of a reasonable character. Alternatively and in the event the evidence shows that plaintiff is disabled, it then alleges that his disability is due solely to a syphilitic condition, which was not aggravated nor made worse by said injury.

It prays that plaintiff's demand be rejected, but, in the alternative and in the event it is found that plaintiff is entitled to compensation, it then prays that it be fixed at $4.68 per week and limited to 125 weeks.

There was judgment in favor of the plain-

tiff holding that he was entitled to compensation and fixing it at $5.46 per week for 175 weeks, subject to a credit of $36 received.

Defendant has appealed. Plaintiff, answering the appeal, prays that his compensation be fixed at the amount and as claimed in his petition.

Defendant's averment that plaintiff is able to do work of a reasonable character is not supported by any evidence. In fact there is no contention to that effect in its brief.

The trial judge examined plaintiff's leg during the trial and says of it in his reasons for judgment: "At this time the plaintiff has an ulcer about 2 inches in diameter on his leg, which is swollen to about twice its size. The ulcer is hard, indurated, pushed outward and discolored. It is a truly distressing sight, and that it is totally disabling is plain from the record and from a mere examination of the plaintiff." This statement of the court is in accord with the evidence. Therefore nothing further need be said on the subject of plaintiff's capacity for work at the present time.

Defendant argues that the ulcer is on the side of the leg. Defendant admits in its answer that the injury, which plaintiff received, was on his shin, and the evidence of the physicians and others is that the injury was on top of the shin bone. The ulcer is therefore not on the side of the leg, but on top of the shin bone.

Defendant contends that the ulcer which exists is not in the same place as the original hurt. The trial judge looked at plaintiff's leg and says, in his reasons for judgment, that the ulcer is in the same place as the original sore. The preponderance of the evidence is that the ulcer now existing is on the same spot where the plaintiff was struck by the pedal he was operating in doing defendant's work. Defendant's contention in this respect is not supported by the evidence.

Defendant contends that plaintiff was practically disabled previous to the injury, basing its argument on plaintiff's answer to the following question propounded by defendant:

"Q. Could you get in and out of an automobile without holding with both your hands on your leg? A. No, sir."

But almost immediately afterwards he was asked by his counsel:

"Q. Did you understand what he asked you? A. I understand he asked me if I had to hold my leg to get in an automobile.

"Q. Did you have any trouble with your leg or have to hold it up to get in an automobile before this pedal hit you? A. No, sir."

Plaintiff, a negro laborer, says in effect that, in answering defendant's question, he meant that he did not have to hold his leg in order to get out of an automobile. His explanation is accepted as indicating what he meant to say.

Defendant contends that plaintiff was cured of the injury, which he received while doing its work, and that he afterwards hurt himself while not working for defendant. In support of this contention, it argues that there is a scar on plaintiff's shin just above the ulcer marking the site of the injury of May 4, 1932.

Two physicians say they noted a small scar in the place claimed by defendant. But it is doubtful, from what they say, if this scar indicates a past injury. It seems to be hardly noticeable, and such a mark on the leg of a negro might result from a mere scratch. Plaintiff says that it is nothing but a scratch mark made 10 or 15 years ago. Two physicians examined plaintiff's leg in the Charity Hospital, and neither of them noticed such a scar. The same contention was presumably urged in the lower court and the trial judge examined plaintiff's leg and stated his finding concerning the appearance of the ulcer, and he does not speak of having noticed any scar. We are satisfied from the evidence that the ulcer, as to which so much has been said, is in the same place where plaintiff was struck by the pedal he was operating on May 4, 1932, and whether there is a scar or scratch near the site or not is of no consequence in the case.

Defendant contends that plaintiff's present condition is due to syphilis, and that under the evidence the injury, which he received on May 4, 1932, but which defendant avers occurred on April 28, 1932, has nothing to do with his present condition. This is the most serious question in the case.

Dr. Cutting examined plaintiff's leg in the Charity Hospital in New Orleans on March 14, 1933. He says that plaintiff undoubtedly would have presented a similar picture regardless of the fact of the slight accident he is said to have sustained as a result of having been struck on the shin. But this statement is to be taken in connection with his further testimony, that the situation was possibly precipitated by trauma.

Dr. Cutting, Dr. May, Dr. Watkins, Dr. Goldsmith, and Dr. White are all substantially in harmony on this subject. We cannot

quote each of them, but a fair summary of the medical testimony on the subject is that when syphilis reaches a certain stage in certain individuals, it spontaneously produces ulcers, such as the plaintiff endures, and that no trauma is necessary as an activating cause, but with others it is different. In some people it does not develop in the malignant form, with which the plaintiff suffers, but remains dormant in the system, unless it is stirred into activity by a traumatic injury, which in some cases must be severe, in others a less hurt is sufficient, in some cases a mere scratch will activate the disease.

The physicians say that patients with syphilis operated on recover from the operation the same as others do. It further appears that syphilis, while dormant, does not interfere with work or labor nor with one's capacity in that respect, and that a man may have it in his system and suffer no evil consequences, as a result, for such a long and indefinite period of time, that no real harm may come of it, unless its virulence is in some way aroused into activity.

Plaintiff testifies that, when he received the blow on his shin, it bled freely; that he tied it up and went on and finished a half day's work. He had already worked, as we understand it, a half day, so he finished the day. That the next morning his leg was so swollen and painful that he went to defendant's office in order to obtain a doctor, and defendant's manager sent him to a doctor.

Mr. Darling, defendant's manager, testifying concerning plaintiff's injury, says that plaintiff came to him one day and said he wanted to get his leg doctored a little bit, that he had strained it on the machine the day before yesterday. Mr. Darling says he asked him why he had waited so long to tell him about it, and that plaintiff replied that he did not think it was going to be anything, but that it was beginning to hurt him.

Mr. Darling says that he glanced at his leg and there was a little abrasion of the skin, no blood; that he asked plaintiff if he wanted him to fix it, and plaintiff said he wanted ed to go home and doctor it and clean it out. That he thought no more about it till two days later plaintiff came back hobbling and said, "My leg is still hurting me;" that he looked at his leg again. It was swollen a little bit, and he gave plaintiff a note to Dr. White.

Dr. White, speaking of the time when plaintiff first came to see him, says that plaintiff had a bruised, lacerated wound, bluish color, about halfway between the knee and ankle.

The wound was infected. He treated him for the wound about 11 weeks and discharged him as cured.

Referring to the appearance of the wound at the time he discharged plaintiff, he says: "The leg looked as smooth as my hand, perfectly healed. I pressed on it. It had no soreness to it."

There is a conflict between the plaintiff and Dr. White as to the length of time that elapsed between the time plaintiff was discharged and the time he returned for further treatment. Plaintiff says that it was 5 or 6 days. Dr. White says it was about 17 days.

Testifying as to what plaintiff told him, when he returned, Dr. White says that plaintiff came in and told him that he had hurt his leg again. He examined his leg and "found a little bruise there again, practically over the site of the same wound or a little below." That he, dressed plaintiff's leg and told him that the compress company was not responsible for this treatment, he (plaintiff) having been discharged about 17 or 18 days previous; that plaintiff said he understood that. Plaintiff did not return, and he afterwards heard that he had gone to New Orleans.

Defendant argues that the delay that elapsed between plaintiff's discharge and return and his failure to return to Dr. White for further treatment, when informed that further treatment would be at plaintiff's own expense, was because his first injury had been cured and the injury he then had was a subsequent injury, and he felt that he had no right to further treatment at defendant's expense. There is no evidence indicating that plaintiff received a second injury. He testifies that he did not, and the testimony of three witnesses, living in the same house in which plaintiff lives, is corroborative that the only injury plaintiff suffered is the one received while working for defendant at the time heretofore stated, and such is our conclusion in the case. Plaintiff had reasons for going to the Charity Hospital, and they seem to us to be reasonable and proper.

Plaintiff testifies that his leg was not well at the time he was discharged, and he is corroborated in that respect by three witnesses, living in the same house in which he lived. He testified that Dr. White said to him at the time he discharged him, "Your leg is all right, you can go back over there and they will give you a little light work." This was presumably in defendant's presence and could have been contradicted, if it had been untrue. It was not contradicted, so we take it that Dr. White made the statement, and that it must be in-

ferred therefrom that plaintiff's leg had improved at the time he was discharged to the extent that he could get about on it and do light work, but that it was not entirely well. There remained some effect of the wound creating some incapacity.

The plaintiff reported to defendant's office for work when discharged. Its agent looked at his leg and did not give him any work. Dr. White says that plaintiff was not given work, because defendant, at the time, had no work that he could do. But defendant's manager did not give that as the reason he was not given work.

The evidence shows that, after getting hurt, plaintiff continued his work for the balance of the day. He says that the wound bled freely and he tied it up, but it does not appear that the wound received any treatment. So we think standing on his leg in the continuance of his work could, and likely served to, aggravate the wound. Dr. White says that when he saw it the next day it was infected. Plaintiff's testimony indicates that it was a severe, painful injury. He was corroborated in that respect by three witnesses, living in the same house in which he resided. The fact that it required 11 weeks' treatment to get him in the condition he was in when discharged indicates that the wound was severe. Therefore the statement of Dr. Cutting that the picture, which plaintiff presented to him on March 14, 1933, would have undoubtedly been the same, regardless of the fact of the slight accident he was said to have sustained, does not receive our assent, except as qualified by his other testimony on the same subject. The fact is Dr. Cutting did not see plaintiff's leg until after plaintiff had been in the hospital for 8 or 9 months, and the condition he saw was the result of activated syphilis.

As for Drs. Watkins and Goldsmith, they did not see plaintiff's leg until say a year after the injury, and what they observed was the result of the activated syphilis.

The evidence does not show how long the syphilis has existed in plaintiff's system. The testimony of the physicians justifies the inference that it may have existed for several years previous to the injury and might have remained dormant without manifesting its presence and without interfering with his ability to do the work of a common laborer for a period of time which cannot be definitely fixed. The evidence does not indicate that plaintiff, at the time he was injured, had suffered any evil result from the syphilis in his system.

Mr. Darling, questioned about how long plaintiff had worked for him and the character of his work, says:

"Q. Now this man worked for you some time before he was injured? A. Yes.

"Q. Good, hard worker? A. He was more or less decrepit. We gave him light work to keep him on the pay roll as much as anything else.

"Q. You had no trouble with him from a compensation standpoint? A. No, sir."

The statement, "more or less decrepit," is very general, and is not entitled to any particular effect. Nothing indicated that the work plaintiff was doing when hurt was work that a decrepit man could do.

Plaintiff testified without contradiction that he had been working for defendant 4 years up to the time he got hurt, and that he had never had any trouble with his leg until he received the injury of which he complains. If this testimony was untrue, it could have been contradicted, and it was not done.

We are therefore satisfied that the injury, which plaintiff received on May 4, 1932, but which defendant alleges was received on April 28, 1932, was a severe, bruising blow over his shin bone, lacerating the flesh, doing serious harm, and that the wound was infected next morning. It is our understanding that a wound of that kind is a very different injury from the cut, made by a surgeon with a sharp knife, and which is of course kept disinfected.

As syphilitic patients heal from operations as others not so diseased, we think the syphilis in plaintiff was wholly dormant and could not have been about to break into activity at the time he was hurt. If such had been the situation, it would likely have manifested itself before the expiration of 11 weeks, and it did not manifest itself and was not noticed by Dr. White during 11 weeks of treatment. It was only after he had been discharged and had been away, plaintiff says 5 or 6 days and Dr. White says about 17 days, and upon his return, that Dr. White noticed syphilitic symptoms at the place of injury. It is therefore our conclusion that the syphilis was aroused into the activity, which it took on, as a result of the injury plaintiff received on his shin; that, if severe injury of the kind stated had not been received, followed by infection, the syphilis would likely have remained dormant, and plaintiff would have continued working and been working to-day.

We think this case in principle comes within the scope of the decision, Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862, and subsequent decisions of the Supreme Court and of this court and the oth-

er Courts of Appeal, following the precedent of the Behan Case.

■ The lower court properly held that plaintiff was entitled to compensation. But there is controversy and a difference of opinion concerning the amount that should be awarded.

Defendant contends that none should be allowed; but that, in the event it is found that he is entitled to recover, it should be as if his leg had been amputated between his knee and ankle. Act No. 20 of 1914, § 8 (amended Act No. 242 of 1928), subsection 1 (d), subd. 13, provides that amputation between the knee and the ankle shall be equivalent to the loss of foot. Subdivision 14 provides that the total loss of the use of a member is equivalent to the amputation of the member. Subdivision 7 provides for the loss of a foot 65 per centum of wages during 125 weeks.

The lower court held that he was entitled to 65 per cent. of wages for 175 weeks, which is the compensation under subsection (d), subd. 8, for the loss of a leg.

Plaintiff contends that he is entitled to compensation as a permanent total disability to do work of any reasonable character under subsection (b), which is 65 per cent. of wages during the period of disability, not, however, beyond 400 weeks.

After considering the evidence on the subject, it seems to us that the plaintiff is correct. If plaintiff's leg should be amputated between his ankle and knee, or if his entire leg should be amputated, he would not be restored to the usefulness of a one-legged man. The pain and disability, which plaintiff suffers, have gone beyond his leg and affected his hip and back.

The medical testimony indicates that he may be cured, but a recovery of the capacity for work, which a man with one foot or leg ordinarily enjoys, is not in sight for this plaintiff. Such a recovery under the evidence, even with continued treatment, is very uncertain. There may be none, and certainly no time can be fixed when a condition of restored ability to do any of the kinds of work he is capable of doing can be determined or said to exist, because the injury to his shin due to the syphilis has spread beyond his leg and will likely continue, unless he can be cured.

In Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9, 11, the court held that the compensation to which an injured person was entitled was to be fixed according to the capacity for work in which his injury has placed him. The injury suffered by Knispel was in his capacity to see how to work. The court, speaking of Knispel, said: "The injury suffered by plaintiff is an injury affecting his capacity to work"—citing Black v. La. Central Lumber Co., 161 La. 889, 109 So. 538. In the Knispel Case the court further said: "The district court found that under the law the injury was permanent, although there was some slight hope of recovery, and that therefore the injury produced permanent disability."

Whitley v. Hillyer-Deutsch-Edwards, Inc., et al., 142 So. 798, 799, and Droddy v. Industrial Lumber Co., Inc., 143 So. 117, decided by this court, are similar in principle. In the Whitley Case we said, referring to the capacity of the plaintiff for work: "As we understand the testimony on this point, however, plaintiff has not lost the total use of his leg, but his injury has resulted in a serious partial disability on his part, as a whole, to do work of any reasonable character." In the Droddy Case, disease, produced by injury to the foot, brought on a permanent total disability to do work of any reasonable character, and we allowed compensation accordingly. In this instance Jones is in a similar situation of disability, growing out of his injury, producing in him what appears at present to be a permanent total disability to do any kind of work that he would otherwise have been capable of doing. We therefore find that plaintiff must be awarded compensation as a permanent total disability to do work of any reasonable character.

■ We agree with the lower court that, according to the preponderance of the evidence, plaintiff's daily wage was 15 cents an hour, and that he worked on an average 8 hours per day. The last week he worked 7 days, but that was not done every week, nor did he average 7 days a week.

In plaintiff's petition he alleges that he worked 6 days a week, and the evidence indicates that his weekly average was 6 days per week. Aside from plaintiff's averment, people do not ordinarily work on Sunday. We have a Sunday law on the subject. In Olinde v. Arundel Corporation, 151 So. 439, recently decided, we discussed a question of this kind, and we now adhere to the conclusion reached in the case mentioned. Plaintiff's compensation will therefore be fixed on a basis of 6 days per week.

For these reasons, the judgment appealed from will be amended and corrected as follows: There will be judgment in favor of the plaintiff, Leon Jones, and against Lake Charles Compress & Warehouse Company, Inc., awarding plaintiff compensation and fix-

ing the amount at 65 per centum of a weekly wage of $7.20, beginning May 4, 1932, subject to a credit of $36 received, his compensation to continue during the period of his disability, not, however, exceeding 400 weeks. Each weekly payment is to draw legal interest from the time it was due until paid. All weekly payments due at this time are to be paid in a lump sum. All further weekly payments to be paid as they come due. Defendant-appellant is to pay the costs in both courts. .